**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Thomas M. Wearsch
Email: twearsch@bakerlaw.com
Mark A. Cymrot
Email: mcymrot@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee for the*
*Substantively Consolidated SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 09-1154 (BRL) |

Plaintiff,

v.

VIZCAYA PARTNERS LIMITED, BANQUE
JACOB SAFRA (GIBRALTAR) LTD. a/k/a BANK J
SAFRA LIMITED, SIAM CAPITAL
MANAGEMENT, ASPHALIA FUND LIMITED, and
ZEUS PARTNERS LIMITED,

Defendants.

## AMENDED COMPLAINT

Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, et seq. ("SIPA"), and Bernard L. Madoff ("Madoff"), by and

through his counsel, Baker & Hostetler LLP, for his Complaint against Vizcaya Partners Limited

("Vizcaya"), Banque Jacob Safra (Gibraltar) Ltd. a/k/a Bank J. Safra Limited ("Bank Safra"),

Siam Capital Management ("Siam"), Asphalia Fund Limited ("Asphalia"), and Zeus Partners

Limited ("Zeus" and collectively, "Defendants") based on actual knowledge and information and

belief, states the following:

## NATURE OF PROCEEDING

1.    This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Bernard L. Madoff.  In early December 2008, BLMIS generated client account statements for its

nearly 7,000 client accounts at BLMIS.  When added together, these statements purportedly

show that clients of BLMIS had approximately $64.8 billion invested with BLMIS.  In reality,

BLMIS had assets on hand worth a small fraction of that amount.  On March 12, 2009, Madoff

admitted to the fraudulent scheme and pled guilty to 11 felony counts.

2.      This adversary proceeding is brought pursuant to 15 §§ U.S.C 78fff(b), 78fff-1(a), and 78fff-2(c)(3), sections 105(a), 542, 547, 548, 550(a) and 551 of 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code") and other applicable law, for turnover, accounting to set aside preferences and fraudulent transfers, and damages.  On August 29, 2008 and October 31, 2008, BLMIS made two payments totaling $180 million to Defendant Bank Safra, which were subsequently transferred, in part, to Defendants Vizcaya, Siam, Asphalia, and Zeus.  The Trustee seeks to set aside these transfers and preserve the property for the benefit of BLMIS' defrauded customers.

## JURISDICTION AND VENUE

3.      This adversary proceeding is brought in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (BRL) ("SIPA Proceeding") is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 ("District Court Proceeding").  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4).

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (F), (H), and (O).

5.      Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND, THE TRUSTEE AND STANDING

6.      On December 11, 2008 ("Filing Date"), Bernard L. Madoff was arrested by federal agents for violation of the criminal securities laws, including inter alia, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the United States District Court which commenced the District Court Proceeding against Madoff and BLMIS (together, the "Madoff

Defendants"). The District Court Proceeding remains pending in the District Court. The SEC complaint alleged that the Madoff Defendants engaged in fraud through the investment advisor activities of BLMIS.

7.     On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to 15 U.S.C. § 78eee(a)(3) and (b)(2), SIPC filed an application in the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

8.     Also on December 15, 2008, Judge Louis L. Stanton of the District Court granted the SIPC application and entered an order pursuant to SIPA ("Protective Decree"), which, in pertinent part:

   (a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C. § 78eee(b)(3);

   (b)     appointed Baker & Hostetler, LLP as counsel to the Trustee pursuant to 15 U.S.C. § 78eee(b)(3); and

   (c)     removed the case to this Bankruptcy Court pursuant to 15 U.S.C. § 78eee(b)(4).

9.     By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

10.     At a criminal plea hearing ("Plea Hearing") on March 12, 2009 in the case captioned United States v. Madoff, Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorneys' Office for the Southern

District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme

through the investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23:14-17.)  Additionally,

Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed

criminal."  (Id. at 23:20-21.)

      11.    As the Trustee appointed under SIPA, the Trustee has the job of recovering and

paying out customer property to BLMIS' customers, assessing claims, and liquidating any other

assets of the firm for the benefit of the estate and its creditors.  The Trustee is in the process of

marshalling BLMIS' assets, and the liquidation of BLMIS' assets is well underway.  However,

such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars

that they invested with BLMIS over the years.  Consequently, the Trustee must use his authority

under SIPA and the Bankruptcy Code to pursue recovery from customers who received

preferences and/or payouts of fictitious profits to the detriment of other defrauded customers

whose money was consumed by the Ponzi scheme.  Absent this or other recovery actions, the

Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of 15

U.S.C. § 78fff-2(c)(1).

      12.    Pursuant to 15 U.S.C. § 78fff-1(a), the Trustee has the general powers of a

bankruptcy trustee in addition to the powers granted by SIPA.  Pursuant to 15 U.S.C. § 78fff(b),

Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 of the Bankruptcy Code are applicable to

this case.

      13.    Pursuant to 15 U.S.C. § 78*lll*(7)(B), the Filing Date is deemed to be the date of the

commencement of the case and the filing of the petition within the meanings of sections 544 and

548 of the Bankruptcy Code.

14.    The Trustee has standing to bring these claims pursuant to 15 U.S.C. § 78fff-1,

§ 78fff-2, and the Bankruptcy Code, including sections 323(b) and 704(a)(1) because, among

other reasons:

(a)    BLMIS incurred losses as a result of the claims set forth herein;

(b)    The Trustee is a bailee of customer funds entrusted to BLMIS for

investment purposes;

(c)    The Defendants received "customer property" as defined in 15 U.S.C. §

78*lll*(4);

(d)    SIPC has not reimbursed, and will not fully reimburse, the customers for

their losses;

(e)    The Trustee is obligated to recover any property transferred by the debtor

which, except for such transfer, would have been customer property to the

extent that such transfer is void or voidable under Title 11, and to allocate

customer property of the debtor in accordance with § 78fff-2(c)(1); and

(f)    The Trustee is the assignee of claims paid, and to be paid, to customers of

BLMIS who have filed claims in the liquidation proceeding (such claim-

filing customers, collectively, "Accountholders").  As of this date hereof,

the Trustee has received multiple express unconditional assignments of the

applicable Accountholders' causes of action, which actions could have

been asserted against Defendants.  As assignee, the Trustee stands in the

shoes of persons who have suffered injury-in-fact and a distinct and

6

palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages.

(g)     SIPC has expressly conferred to the Trustee its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds;

(h)     The Trustee has the power and authority to avoid and recover transfers pursuant to sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

### THE FRAUDULENT PONZI SCHEME

15.     BLMIS is a New York limited liability company that is wholly owned by Madoff. Founded in 1960, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS with family members and employees.  BLMIS had three business units: investment advisory ("IA Business"), market making and proprietary trading.

16.     Madoff ascribed the IA Business consistent investment success to his investment strategy called the "split-strike conversion" strategy which involved the purchase of securities, options and government securities.

17.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities, options and government securities that were owned in, or had been traded through, their accounts, and the growth of and profit from those accounts over time, these statements, including the statements referred to in Paragraph 1, were a complete fabrication.  The security purchases and trades depicted in the account statements never occurred and the profits reported were entirely fictitious.  At the Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts.

18.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and the Madoff Defendants concealed the ongoing fraud in an effort to hinder and delay current and prospective customers of BLMIS from discovering the fraud.  The money received from new investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to, or payments on behalf of, the other earlier investors.   The money sent to BLMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates and others until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

19.     During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts, which profits were fictitious.  Other investors, from time to time, redeemed or closed their accounts, transferred portions to other accounts or removed portions of them, and were paid consistently with the statements they had been receiving.  Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

20.     When payments were made to or on behalf of these investors, including Defendants Bank Safra, Vizcaya, Siam, Zeus, and Asphalia, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains.  In reality, BLMIS had largely or wholly dissipated the investors' principal and had not made any profits whatsoever.  In an attempt to conceal the ongoing fraud and thereby hinder, delay, and defraud current and prospective investors, BLMIS paid to or on behalf of such investors some or all of the inflated amount reflected in the falsified customer statements, including non-existent principal and fictitious profits, not such investors' true depleted account balances.

21.    BLMIS used the funds deposited from new investors and new investments from
existing customers to continue operations and pay redemption proceeds to or on behalf of other
investors and to make other transfers.  Due to the siphoning and diversion of newly invested
funds to pay requests for payments or redemptions from older account holders, BLMIS did not
have the funds to repay the principal amounts due to the new investors on account of their newly
invested funds.  BLMIS was able to avoid detection of its fraud only by using the principal
invested by new clients to pay the old investors or their designees.

## THE DEFENDANTS AND THE TRANSFERS

### *The Defendants*

22.    Defendant Vizcaya is an international business company organized under the laws
of the British Virgin Islands.  Vizcaya invested all of its assets with BLMIS and was at all times
relevant hereto a client of BLMIS' IA Business.

23.    Defendant Zeus is a limited company incorporated on November 23, 2004 and
organized under the laws of the British Virgin Islands under the International Business
Companies Act (Cap. 291).

24.    Defendant Asphalia is an investment fund and limited company, originally
incorporated in the Bahamas and, as of December 29, 2004, organized under the laws of the
Cayman Islands under the Companies Act (Revised).

25.    Defendant Siam is a company organized in Bermuda which acts as an investment
manager and financial services provider.  Siam conducts business in New York and is currently a
plaintiff in a federal district court case in New York, captioned *Siam Capital Management Ltd. v.
Baker & McKenzie LLP, et al.*, No. 08-1468 (E.D.N.Y.).

26.    Defendant Bank Safra is a banking institution with an address at 5763 Line Wall
Road, Gibraltar.

***Defendants' inter-relationships and connections to Vizcaya's Account at BLMIS***

27.     At all times relevant hereto, Siam served as Investment Manager and controlling entity for Vizcaya, Zeus, and Asphalia.  Siam caused Zeus and Asphalia to transfer money into Vizcaya for the purpose of investing in BLMIS in New York.

28.     At all times relevant hereto, Bank Safra was a banker and custodian for Vizcaya, Zeus, Asphalia, and Siam.  Bank Safra received $6.43 million in connection with the redemption by Zeus of funds from BLMIS, establishing Bank Safra both as the bank to which the BLMIS money at issue was sent and the apparent beneficial owner of that money.

29.     Siam, with the intent to trade securities in New York for the benefit of Zeus and Asphalia, caused Vizcaya to open and maintain an account as a client of the IA Business. According to BLMIS' records, Vizcaya maintained an account with BLMIS through its custodian, Bank Safra, that was designated account 1FR083 ("Vizcaya Account").

30.     The Vizcaya Account was opened on or about December 21, 2001 when Banque Safra – France SA executed and delivered on behalf of Vizcaya (and for the benefit of Zeus, Asphalia, and Siam) a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options ("Account Agreements") to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York.

31.     The Customer Agreement states that all transactions are subject to the Securities Exchange Act of 1934, the Commodities Exchange Act, the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System and the Commodities Futures Trading Commission, and all laws of the United States.   The Customer Agreement further states that the agreement is deemed to have been made in New York and that it shall be construed under New York law.

32.     On March 23, 2005, Bank Safra took over for Bank Safra – France SA as custodian for Vizcaya and sent in a newly executed Customer Agreement, Option Agreement, Trading Authorization Limited to Purchases and Sales of Securities and Options, and IRS form. The 2005 Customer Agreement, by its terms, expressly represented that the contract was deemed to be entered into in New York and that it would be governed by the laws of the State of New York.

33.     Between January 2002 and the Filing Date, Defendants Siam, Zeus, and Asphalia caused Defendant Vizcaya to invest $327,249,925 with BLMIS through 26 separate wire transfers directly into BLMIS' account at JPMorgan Chase & Co. in New York, New York, Account #000000140081703 ("BLMIS Bank Account").

34.     On or about August 29, 2008, BLMIS wired $30,000,000 ("Two-Year Transfer") from the BLMIS Bank Account in New York to Defendant Bank Safra, apparently for the benefit of Defendants Vizcaya and Zeus.

35.     On or about October 31, 2008, BLMIS wired $150,000,000 ("Transfer") from the BLMIS Bank Account in New York to Defendant Bank Safra, which funds were subsequently transferred, in part, to Defendants Vizcaya, Siam, Zeus, and Asphalia, and Bank Safra.

36.     As described in more detail below, Vizcaya was the instrumentality of Siam, Zeus, and Asphalia, which each functioned as a mere department of the others and acted as the others' agents and alter egos.  Vizcaya acted in New York as the agent for Siam, Zeus, and Asphalia, and did so for their benefit and with their knowledge and consent.  Additionally, Defendants Vizcaya, Siam, Zeus, and Asphalia are mere departments, agents, and alter egos of one another, sharing among themselves common control in terms of personnel and common financial interests and fee sharing arrangements.

37.     Defendants Vizcaya, Siam, Zeus, and Asphalia share common control, as Gerard Vila is a director of each entity.  The financial interests of these entities are interwoven.

38.     The primary sources of Vizcaya's investments are funds from Zeus and Asphalia.

39.     Siam directed and controlled all the investment decisions of Vizcaya, Zeus, and Asphalia.

40.     All money that Zeus and a subaccount of Asphalia put into Vizcaya was invested in BLMIS.  This investment decision was made with the knowledge of investors in Zeus and Asphalia, and at the direction of Siam, with the intention of trading securities in New York.

41.     On August 29, 2008, Zeus caused Vizcaya to request and receive a withdrawal of $30,000,000 from its brokerage account with BLMIS in New York.  From its bank account in New York, New York, BLMIS directed this amount to the benefit of Vizcaya at Bank Safra. Upon information and belief, these funds were subsequently transferred to Zeus.

42.     Vizcaya made another redemption request at the direction of both Zeus and Asphalia on or around October 31, 2008, this time for the withdrawal of $150,000,000 from its brokerage account with BLMIS in New York.  From its bank account in New York, New York, BLMIS directed this amount to the benefit of Vizcaya at Bank Safra.

43.     Gerard Vila, a director of each of Defendants Vizcaya, Siam, Zeus, and Asphalia, caused Vizcaya to transfer funds from the $150,000,000 transfer to Defendants as described in more detail below.  Funds from this transfer are currently frozen in Gibraltar and constitute customer property, traceable from BLMIS to Defendants.

44.     Each of Defendants Vizcaya, Siam, Zeus and Asphalia is represented by the law firm of Katten Muchin Rosenman LLP ("Katten") in New York.  When Vizcaya's account with BLMIS was initially opened, it was opened by Katten's predecessor firm Rosenman & Colin

LLP in New York.  Since February 25, 2009, Vizcaya, Siam, Zeus, and Asphalia have collectively paid Katten at least $278,957.78.

45.     Upon information and belief, of the $150,000,000 transferred from BLMIS in New York to Bank Safra, $67,000,000 was transferred to Asphalia in two separate transfers of $65,000,000 and $2,000,000 on November 2, 2008 and November 26, 2008, respectively. $78,000,000 was transferred to Zeus on November 3, 2008.

46.     Upon information and belief, Vizcaya transferred to Siam $725,865 in management fees in two separate transfers of $362,700.91 on November 14, 2008 and $363,163.70 on December 2, 2008.

47.     Upon information and belief, Asphalia transferred a total of $312,504 to Siam as management fees in two transfers of $156,388.66 and $156,115.24 on November 14, 2008 and December 12, 2008, respectively.

48.     Upon information and belief, Siam paid Zeus a "Broker Fee … & Reserve Fee" and "Rebate" totaling $453,143.69 in two separate payments of $226,427.39 and $226,716.30 on November 18, 2008 and December 3, 2008, respectively.  These transfers are particularly noteworthy as the normal course of business is for funds to pay their investment managers a fee for brokering deals, and not the other way around.  Such unconventional transfers of funds are demonstrative of the common control and financial interests of Defendants Vizcaya, Siam, Zeus, and Asphalia.

49.     Upon information and belief, Zeus paid Siam "Management Fees" totaling $678,205.64 in two separate transfers of $339,413.51 and $338,792.13 on November 14, 2008 and December 12, 2008, respectively.

50.    Siam, therefore, received money from Zeus, Asphalia, and Vizcaya for its services as investment advisor.

51.    Upon information and belief, Bank Safra received $31,405.19 from Asphalia as "Custody Fees" in two separate transfers of $15,699.87 and $15,705.32 on November 25, 2008 and November 28, 2008, respectively.  Zeus paid Bank Safra $45,300.46 in custody fees in two separate transactions of $22,639.72 and $22,660.74 on November 25, 2008 and November 28, 2008, respectively.

52.    Upon information and belief, Bank Safra also received $565,171.37 in "Rebate Fees" from Siam in two separate payments of $282,844.59 and $282,326.78 on November 18, 2008 and December 2, 2008, respectively.

53.    Defendants' possession of customer property flows from the transfer of funds from BLMIS to Bank Safra.

## GIBRALTAR PROCEEDINGS

54.    Vizcaya commended a Judicial Review Action in February 2009 in response to a "no consent" notice issued by the Gibraltar Financial Intelligence Unit ("GFIU") of the Royal Gibraltar Police on January 9, 2009, and the GFIU's subsequent refusal to consent to the release of moneys held by Bank Safra as custodian for Vizcaya.  Thereafter, on February 3, 2009, the GFIU issued a general no consent ruling with respect to all transactions on the Vizcaya, Zeus, and Asphalia accounts at Bank Safra.

55.    Bank Safra was named as an interested party to that litigation.  By order of May 19, 2009, the Trustee was added as the Second Interested Party to the Vizcaya Judicial Review Action.  The Court issued two orders in February and April allowing the payment of a total of

$700,000 out of the funds held by Vizcaya for the purposes of taking legal advice in various jurisdictions, including New York.

56.    On June 18, 2009, this Court transmitted a letter of request seeking the judicial assistance of the Supreme Court of Gibraltar and seeking, inter alia, an order that the accounts of Vizcaya, Zeus, Asphalia, and Siam at Bank Safra be turned over to this Court.  The Trustee also has filed a claim in the Supreme Court of Gibraltar seeking a freezing order, disclosures, and turnover of the accounts to this Court.

57.    Bank Safra has paid the sum held in the account of Vizcaya, US$10,030,684 into the Supreme Court of Gibraltar pending further order of that Court.  In addition, Bank Safra petitioned the Supreme Court of Gibraltar for an order authorizing Bank Safra to pay into that Court the sums it held for the accounts of Zeus and Asphalia, totaling approximately US$63 million.  A hearing on that petition is scheduled for October 2009.

58.    Siam filed a separate action in August 2009 against the Gibraltar Attorney General and Bank Safra, seeking the lifting of the GFIU's "no consent" notice with respect to certain funds held by Siam.

59.    The Supreme Court of Gibraltar has yet to rule on any of the pending motions.

## PERSONAL AND IN REM JURISDICTION

### Personal Jurisdiction

60.    This Court properly has jurisdiction over Defendants Vizcaya, Zeus, Asphalia, and Siam.  By their terms, the Vizcaya Account Agreements were deemed to be entered into in the State of New York and were to be performed in New York, New York through securities trading activities that would take place in New York, New York.  The Vizcaya Account was held in New York, New York, and Defendants Siam, Zeus, and Asphalia caused Vizcaya to wire

funds from its account at Bank Safra to the BLMIS Bank Account in New York, New York for

application to the Vizcaya Account and the conducting of trading activities in New York.

Defendants Siam, Zeus, and Asphalia directed Vizcaya to act in New York by investing in

BLMIS.  It was as their agent and for their benefit that Vizcaya did so.  Defendants Vizcaya,

Siam, Zeus, and Asphalia, as mere instrumentalities, agents, and alter egos of each other,

purposefully availed themselves of the benefits of conducting transactions in the State of New

York and it is out of these transactions that the instant action arises.  Defendants, therefore, have

submitted themselves to the jurisdiction of the courts of New York.

61.    This Court properly has jurisdiction over Defendant Bank Safra because Bank

Safra conducted business in New York for Vizcaya, Siam, Zeus, and Asphalia.  Bank Safra also

entered into agreements with BLMIS on behalf of Vizcaya on March 23, 2005.

62.    Additionally, at all times relevant hereto, Bank Safra and its affiliates have

consistently engaged in banking business and investment activities in New York, New York,

including, but not limited to, the solicitation of investors and the conducting of trading and

money management activities.  As such, Bank Safra and its affiliates have subjected themselves

to the general jurisdiction of this Court.

**In rem *Jurisdiction***

63.    Upon information and belief, Vizcaya retained $4,183,402 of customer property,

Asphalia retained $1,525,028 of customer property, Zeus retained $61,205,180 of customer

property, and Siam retained $698,259 of customer property.

64.    Upon information and belief, Bank Safra retained approximately $6.43 million of

customer property.

65.     The Trustee is seeking customer property as defined in 15 U.S.C. § 78*lll*(4).  SIPC

has expressly conferred to the Trustee its rights of subrogation with respect to payments it has

made and is making to customers of BLMIS from SIPC funds.  The funds in BLMIS' JPMorgan

Chase Account in New York were all customer property, as defined, from the moment they

entered the account.  Moreover, the SIPA statute provides that those funds thereafter retained

their character as customer property.  15 U.S.C. § 78fff-2(c)(3).  The claims of the customers and

of SIPC to their money are specific and in this case we trace the money from that account at

JPMorgan Chase in New York to Bank Safra for the benefit of Vizcaya, and then, upon

information and belief, to Zeus, Asphalia, Siam, and Bank J. Safra (Switzerland) Ltd. for the

benefit of Bank Safra.  Tracing that customer property gives this Court jurisdiction over it.

66.     Consequently, each of Defendants Vizcaya, Siam, Zeus, and Asphalia possess

property that is subject to this Court's *in rem* jurisdiction pursuant to 28 USC § 1334.

### RELIEF SOUGHT

67.     This Complaint seeks the return of both the $150,000,000 and $30,000,000

transfers made by BLMIS to Defendants or the value of such transfers.

68.     The funds transferred were customer property *ab initio*, without any action from

the Court, and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4) and

15 U.S.C. § 78fff-2(c)(3).  They are subject to turnover pursuant to section 542 of the

Bankruptcy Code.

69.     The Transfer is avoidable as a preference and fraudulent conveyance and is

recoverable under sections 547, 548, 550, and 551 of the Bankruptcy Code, and applicable

provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

70.    The Two-Year Transfer is avoidable as a fraudulent conveyance and is recoverable under sections 548, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

71.    Based on the fraudulent conduct herein alleged, and the fact that both transfers are traceable from BLMIS' account at JPMorgan Chase in New York to Bank Safra for the benefit of Vizcaya, and then, upon information and belief, in part to Zeus, Asphalia, Siam, and Bank J. Safra (Switzerland) Ltd. for the benefit of Bank Safra, a constructive trust over the proceeds of both transfers should be established by the Court in favor of the Trustee for the benefit of the BLMIS estate.

**COUNT ONE**
**PREFERENTIAL TRANSFER - 11 U.S.C. §§ 547(b), 550, AND 551**

72.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

73.    The Transfer constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

74.    The Transfer was made to or for the direct or indirect benefit of Bank Safra, Vizcaya, Zeus, Asphalia, and Siam..

75.    The Transfer was made on account of an antecedent debt owed by BLMIS before such Transfer was made.

76.    The Transfer was made while BLMIS was insolvent.

77.    The Transfer was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

78.    The Transfer enabled Bank Safra, Vizcaya, Zeus, Asphalia, and Siam  to receive more than they would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code,

(ii) the Transfer had not been made, and (iii) they received payment of such debt to the extent

provided by the provisions of the Bankruptcy Code.

79.     At the time of the Transfer, Bank Safra, Vizcaya, Zeus, Asphalia, and Siam were

"creditors" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and

pursuant to 15 U.S.C. § 78fff-2(c)(3).

80.     The Transfer constitutes a preferential transfer avoidable by the Trustee pursuant

to section 547(b) of the Bankruptcy Code.

81.     The Transfer, or the value of the property transferred, is recoverable from Bank

Safra, Vizcaya, Zeus, Asphalia and Siam as initial, immediate or mediate transferees, or entities

for whose benefit the Transfer was made, pursuant to section 550(a) of the Bankruptcy Code.

82.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to

sections 547(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Transfer,

(b) directing that the Transfer be set aside, and (c) recovering the Transfer, or the value thereof,

for the benefit of the estate of BLMIS.

## COUNT TWO
## TURNOVER AND ACCOUNTING – 11 U.S.C. § 542

83.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

84.     The Transfer constitutes property of the estate to be recovered and administered

by the Trustee pursuant to section 541 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3) and

78*lll*(4).

85.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code and

15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to the immediate payment and turnover of the

Transfer from the Defendants to the Trustee.

86.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is also entitled to an accounting of all transfers received by Defendants from BLMIS, directly or indirectly.

## COUNT THREE
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550, AND 551

87.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

88.     The Transfer was made on or within two years before the filing date of the BLMIS case.

89.     The Transfer was made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS' then existing or future creditors.

90.     The Transfer constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and is recoverable pursuant to section 550(a) of the Bankruptcy Code.

91.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfer, (b) directing that the Transfer be set aside, and (c) recovering the Transfer, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

## COUNT FOUR
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B) , 550, AND 551

92.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

93.     The Transfer was made on or within two years before the Filing Date.

94.     BLMIS received less than a reasonably equivalent value in exchange for the Transfer.

20

95.      At the time of the Transfer, BLMIS was insolvent, or became insolvent as a result of the Transfer.

96.      At the time of the Transfer, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

97.      At the time of the Transfer, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS' ability to pay as such debts matured.

98.      The Transfer constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and are recoverable pursuant to section 550(a) of the Bankruptcy Code.

99.      As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfer, (b) directing that the Transfer be set aside, and (c) recovering the Transfer, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

## COUNT FIVE
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550, AND 551

100.      The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

101.      The Two-Year Transfer was made on or within two years before the filing date of the BLMIS case.

102.      The Two-Year Transfer was made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS' then existing or future creditors.

103.     The Two-Year Transfer constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and is recoverable pursuant to section 550(a) of the Bankruptcy Code.

104.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two-Year Transfer, (b) directing that the Two-Year Transfer be set aside, and (c) recovering the Two-Year Transfer, or the value thereof, from Defendants Bank Safra, Zeus, and Vizcaya for the benefit of the estate of BLMIS.

**COUNT SIX**
**FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B) , 550, AND 551**

105.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

106.     The Two-Year Transfer was made on or within two years before the Filing Date.

107.     BLMIS received less than a reasonably equivalent value in exchange for the Two-Year Transfer.

108.     At the time of the Two-Year Transfer, BLMIS was insolvent, or became insolvent as a result of the Two-Year Transfer.

109.     At the time of the Two-Year Transfer, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

110.     At the time of the Two-Year Transfer, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS' ability to pay as such debts matured.

111.    The Two-Year Transfer constitutes a fraudulent transfer avoidable by the Trustee

pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable pursuant to section

550(a) of the Bankruptcy Code.

112.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of

the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two-

Year Transfer, (b) directing that the Two-Year Transfer be set aside, and (c) recovering the Two-

Year Transfer, or the value thereof, from Defendants Bank Safra, Vizcaya, and Zeus for the

benefit of the estate of BLMIS.

## COUNT SEVEN
## TURNOVER AND ACCOUNTING – 11 U.S.C. § 542

113.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

114.    The Two-Year Transfer constitutes property of the estate to be recovered and

administered by the Trustee pursuant to section 541 of the Bankruptcy Code and 15 U.S.C. §

78fff-2(c)(3) and 78*lll*(4).

115.    As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code and

15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to the immediate payment and turnover of the

Two-Year Transfer from Defendants Bank Safra, Vizcaya, and Zeus to the Trustee.

116.    As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the

Trustee is also entitled to an accounting of all transfers received by Defendants Bank Safra,

Vizcaya, and Zeus from BLMIS, directly or indirectly.


**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor

of the Trustee and against the Defendants as follows:

(a)      On the First Claim for Relief, pursuant to sections 547, 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Transfer, (b) directing that the Transfer be set aside, and (c) recovering the Transfer, or the value thereof, from Defendants for the benefit of the estate of BLMIS;

(b)      On the Second Claim for Relief, pursuant to section 542 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3): (a) that the property that was the subject of the Transfer be immediately delivered and turned over to the Trustee by the Defendants, and (b) for an accounting by the Defendants of the property that was the subject of the Transfer or the value of such property and all other transfers of property by BLMIS to Defendants, whether direct or indirect;

(c)      On the Third Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Transfer, (b) directing that the Transfer be set aside, and (c) recovering the Transfer, or the value thereof, from Defendants for the benefit of the estate of BLMIS;

(d)      On the Fourth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Transfer, (b) directing that the Transfer be set aside, and (c) recovering the Transfer, or the value thereof, from Defendants for the benefit of the estate of BLMIS;

(e)      On the Fifth Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two-Year Transfer, (b) directing that the Two-Year Transfer be set aside, and (c) recovering the Two-Year Transfer, or the value thereof, from Defendants Bank Safra, Vizcaya, and Zeus for the benefit of the estate of BLMIS;

(f)      On the Sixth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two-Year Transfer, (b) directing that the Two-Year Transfer be set aside, and (c) recovering the Two-Year Transfer, or the value thereof, from Defendants Bank Safra, Vizcaya, and Zeus for the benefit of the estate of BLMIS;

(g)      On the Seventh Claim for Relief, pursuant to section 542 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3): (a) that the property that was the subject of the Two-Year Transfer be immediately delivered and turned over to the Trustee by Defendants Bank Safra, Vizcaya, and Zeus, and (b) for an accounting by Defendants Bank Safra, Vizcaya, and Zeus of the property that was the subject of the Two-Year Transfer or the value of such property and all other transfers of property by BLMIS to Defendants Bank Safra, Vizcaya, and Zeus, whether direct or indirect;

(h)      On all Claims for Relief, pursuant to federal common law and sections 5001 and 5004 of the N.Y. C.P.L.R., awarding the Trustee prejudgment interest from the date on which any transfer of BLMIS funds, assets, or property were received by each Defendant;

(i)     On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS' estate;

(i)     Reserving the Trustee's ability to supplement the information on the Transfer, Two-Year Transfer, and any additional transfers and seek recovery of such additional transfers.

(j)     Awarding the Trustee all applicable attorneys' fees, interest, costs, and disbursements of this action; and

(k)     Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: New York, New York
       September 30, 2009

/s/ Mark A. Cymrot
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Thomas M. Wearsch
Email: twearsch@bakerlaw.com
Mark A. Cymrot
Email: mcymrot@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

300029791